United States Court of Appeals,

Eleventh Circuit.

No. 95-6861.

Willie Mae HARRIS, individually and on behalf of all others similarly situated; Linda Patton, individually and on behalf of all others similarly situated; Taenika Patton, individually and on behalf of all others similarly situated; John Patton, individually and on behalf of all others similarly situated; Tommy Gordon, individually and on behalf of all others similarly situated; Bertha J., individually and on behalf of all others similarly situated, Plaintiffs-Appellees,

v.

Fob JAMES, Governor; David Toney, Commissioner of the Alabama Medicaid Agency, Defendants-Appellants.

Nov. 6, 1997.

Appeal from the United States District Court for the Middle District of Alabama. (No. CV-94-A-1422-N), W. Harold Albritton, Judge.

Before ANDERSON, Circuit Judge, and FAY and KRAVITCH, Senior Circuit Judges.

ANDERSON, Circuit Judge:

In the instant case, plaintiffs-appellees brought a class action under 42 U.S.C. § 1983, alleging that Alabama's Medicaid plan was not in compliance with a federal regulation requiring State Medicaid plans to ensure necessary transportation for recipients to and from providers. The district court granted summary judgment to the plaintiffs and later approved a remedial plan agreed to by the parties. On appeal, the State officials (hereinafter referred to as "the State") argue that the regulation does not create a right enforceable in a § 1983 action. For the reasons below, we accept the officials' argument and reverse the judgment of the district court.

I. FACTS AND BACKGROUND

Here, we set out only the facts relevant to the instant appeal. In particular, because the State does not challenge the district court's conclusion that the plan was not in compliance with the regulation, we do not detail the facts underlying the lower court's finding of noncompliance.[1]

---

[1]Those facts are set out in the district court's published opinion. *Harris v. James,* 896 F.Supp. 1120 (M.D.Ala.1995).

We begin by revisiting our previous description of the Medicaid program. In *Silver v. Baggiano,* 804 F.2d 1211 (11th Cir.1986), we wrote:

> Medicaid is a cooperative venture of the state and federal governments. A state which chooses to participate in Medicaid submits a state plan for the funding of medical services for the needy which is approved by the federal government. The federal government then subsidizes a certain portion of the financial obligations which the state has agreed to bear. A state participating in Medicaid must comply with the applicable statute, Title XIX of the Social Security Act of 1965, as amended, 42 U.S.C. § 1396, *et seq.,* and the applicable regulations.

*Id.* at 1215.

On November 2, 1994, the plaintiffs filed suit under 42 U.S.C. § 1983, arguing that the State's Medicaid plan failed to ensure non-emergency transportation as required by federal law. Specifically, the plaintiffs relied on a regulation which provides:

> A State plan must—

(a) Specify that the Medicaid agency will ensure necessary transportation for recipients to and from providers; and

(b) Describe the methods that the agency will use to meet this requirement.

42 C.F.R. § 431.53. The defendants moved for dismissal or, alternatively, for a stay pending "administrative and legislative review and action." In a memorandum order denying the motion, the district court described the arguments raised by the defendants' brief:

> The most important of these [arguments] is Defendants' contention that no specific non-emergency transportation benefits are mandated by federal statute. They argue that the statute itself does not require transportation, so that the regulation referring to transportation goes beyond the congressional mandate. Therefore, Defendants contend, the regulation does not create a right which is enforceable under § 1983. They argue further that although the Medicaid regulations that implement the statute recognize the need for transportation, those regulations fail to spell out any specific parameters or requirements regarding transportation. Defendants contend that the issue has been left non-specific so that each state may best deal with this issue as it sees fit. Consequently, Defendants argue that Plaintiffs have not asserted a valid cause of action under 42 U.S.C. § 1983.

883 F.Supp. 1511, 1513 (M.D.Ala.1995). In a thorough opinion, the district court reviewed the relevant case law and rejected the defendants' arguments. *Id.* at 1514-22. After the district court granted summary judgment in favor of the plaintiffs, 896 F.Supp. 1120 (M.D.Ala.1995), the defendants filed the instant appeal.

2

## II. ISSUE

The narrow issue presented for decision today is whether Medicaid recipients have a federal right to transportation which may be enforced in an action under § 1983.[2]

## III. DISCUSSION

We begin by reviewing the Supreme Court's case law governing whether and under what circumstances violations of federal statutes create a cause of action under 42 U.S.C. § 1983.[3] Then, we apply that case law to the case before us today.

A. *The Supreme Court's Case Law*

In 1980, the Supreme Court rejected the argument that § 1983 creates a cause of action only for constitutional violations and for the violation of civil rights and equal protection laws; the Court held that the statute encompasses claims based on "purely statutory" violations of federal law. *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). By 1987, the Supreme Court had recognized two limitations to the broad proposition that § 1983 is available to enforce violations of federal statutes by agents of the state. *See Wright v. Roanoke Redevelopment & Hous. Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987) (citing decisions subsequent to *Thiboutot* ). First, plaintiffs cannot sue under § 1983 for violations of a federal statute where "Congress has foreclosed such enforcement of the statute in the enactment itself." *Id.* Second,

---

[2]Plaintiffs argue that the State in its initial brief preserved only the argument that the regulation is not a valid interpretation of the statute. Having reviewed the briefs carefully, we conclude that while it is true that the State chose to argue the point primarily by challenging the validity of the regulation, the initial brief did adequately raise the broad question regarding whether plaintiffs have a "federal right" to transportation enforceable under § 1983. We note also that the "federal right" issue was presented to and ruled upon by the district court, and on appeal, both parties were given an additional opportunity to address the issue in letter briefs requested by the panel.

[3]42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress.

because § 1983 speaks in terms of "rights, privileges, or immunities," not merely violations of federal law, only "federal rights" are enforceable under § 1983. *Id.* Because our resolution of the instant case turns on the second of the two limitations—i.e., the "federal rights" issue, we do not detail the portions of the Supreme Court decisions dealing with the first limitation.[4]

In *Wright,* the plaintiffs claimed that the defendant housing authority had overbilled them for utilities and had thus violated a federal statute imposing a rent ceiling and the statute's implementing regulations, which required public housing authorities to include a reasonable utility allowance in tenants' rent. In answer to the defendant's claim that neither the statute nor the regulations gave the tenants an enforceable right within the meaning of § 1983, the Court wrote succinctly:

> We perceive little substance in this claim. The Brooke Amendment could not be clearer: as further amended in 1981, tenants could be charged as rent no more and no less than 30 percent of their income. This was a mandatory limitation focusing on the individual family and its income. The intent to benefit tenants is undeniable. Nor is there any question that HUD interim regulations, in effect when this suit began, expressly required that a "reasonable" amount for utilities be included in rent that a PHA was allowed to charge, an interpretation to which HUD has adhered both before and after the adoption of the Brooke Amendment. HUD's view is entitled to deference as a valid interpretation of the statute, and Congress in the course of amending that provision has not disagreed with it.
>
> Respondent nevertheless asserts that the provision for a "reasonable" allowance for utilities is too vague and amorphous to confer on tenants an enforceable "right" within the meaning of § 1983 and that the whole matter of utility allowances must be left to the discretion of the PHA, subject to supervision by HUD. The regulations, however, defining the statutory concept of "rent" as including utilities, have the force of law ..., they specifically set out guidelines that the PHAs were to follow in establishing utility allowances, and they require notice to tenants and an opportunity to comment on proposed allowances. In our view, the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under *Pennhurst* [*Pennhurst State School & Hosp. v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ] and § 1983, rights that are not, as respondent suggests, beyond the competence of the judiciary to enforce.

*Id.* at 430-32, 107 S.Ct. at 773-75 (footnotes omitted).[5]

---

[4]We note for the interested reader that *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 520-23, 110 S.Ct. 2510, 2523-25, 110 L.Ed.2d 455 (1990), rejected an argument that "Congress has foreclosed enforcement of the Medicaid Act under § 1983."

[5]In dissent, Justice O'Connor, joined by Chief Justice Rehnquist and Justices Powell and Scalia, argued that there was no federal right enforceable under § 1983. The dissenters argued

4

In *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), the Court considered whether the petitioner, a cab company involved in a labor dispute, could sue under § 1983 to vindicate violations of the rule of law announced in *Lodge 76, International* Ass'n of *Machinists and Aerospace Workers v. Wisconsin Employment Relations Com'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). In *Machinists,* the Court had "reiterated that Congress intended to give parties to a collective-bargaining agreement the right to make use of "economic weapons,' not explicitly set forth in the Act, free of government interference." *Golden State Transit,* 493 U.S. at 110-11, 110 S.Ct. at 451. In *Golden State Transit,* petitioners brought suit under § 1983 seeking monetary damages for city interference which the Court, in an earlier case, had held violated federal law under *Machinists.* Having noted that there was no "substantial question" that the holding in the previous case was "within the competence of the judiciary to enforce," the Supreme Court concluded that the petitioner was "the intended beneficiary of a statutory scheme that prevents governmental interference with the collective-bargaining process and that the NLRA gives [petitioner] rights enforceable against governmental interference in an action under § 1983." *Id.* at 109, 110 S.Ct. at 450. As for the argument of the courts below that no § 1983 cause of action could lie because government interference with the use of "economic weapons" did not constitute a "direct violation" of the statute, the Court wrote:

> We have held, based on the language, structure, and history of the NLRA, that the Act protects certain rights of labor and management against governmental interference. While it is true that the rule of the *Machinists* case is not set forth in the specific text of an enumerated section of the NLRA, that might well also be said with respect to any number of rights or obligations that we have found implicit in a statute's language. A rule of law that is the product of judicial interpretation of a vague, ambiguous, or incomplete statutory

that neither the language of the Brooke Amendment, nor its legislative history, nor its interpretation by HUD supported the conclusion that Congress intended to create an entitlement to reasonable utilities and that, even assuming that regulations alone could create federal rights, the regulations at issue simply were not capable of judicial enforcement because they neither provided a basis for calculating an individual tenant's rent nor provided for a remedy in the event of a violation. *Id.* at 432-41, 107 S.Ct. at 775-80. As we discuss below, the dissenters also expressed strong reservations regarding the issue that they assumed *arguendo*—i.e., that regulations alone could create federal rights. *Id.* at 437-38, 107 S.Ct. at 777-78.

5

provision is no less binding than a rule that is based on the plain meaning of a statute. The violation of a federal right that has been found to be implicit in a statute's language and structure is as much a "direct violation" of a right as is the violation of a right that is clearly set forth in the text of the statute.

*Id.* at 111-12, 110 S.Ct. at 451. According to the Court, "the interest in being free of governmental regulation of the "peaceful methods of putting economic pressure upon one another,' ... is a right specifically conferred on employers and employees by the NLRA." *Id.* at 112, 110 S.Ct. at 452 (quoting *Machinists,* 427 U.S. at 154, 96 S.Ct. at 2560).[6]

In *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Court summarized the test that previous decisions had developed for determining whether the statute in question creates a "federal right" enforceable under § 1983. According to the Court:

Such an inquiry turns on whether the provision in question was intend[ed] to benefit the putative plaintiff.... If so, the provision creates an enforceable right unless it reflects merely a congressional preference for a certain kind of conduct rather than a binding obligation on the governmental unit, ... or unless the interest the plaintiff asserts is too vague and amorphous such that it is beyond the competence of the judiciary to enforce.

*Id.* at 509, 110 S.Ct. at 2517 (citations and internal quotations omitted). The Court applied this test ("the three-prong test"[7]) to the following facts. Plaintiff health care providers brought a § 1983 suit to enforce an amendment to the Medicaid Act requiring State plans to

provide ... for payment ... of [services] ... through the use of rates (determined in accordance with methods and standards developed by the State ... ) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities....

*Id.* at 502-03, 110 S.Ct. at 2514 (quoting 42 U.S.C. § 1396a(a)(13)(A)). According to the plaintiffs, the reimbursement formula used by the Commonwealth of Virginia did not generate rates that were "reasonable and adequate" as defined by the statute. The defendants argued that plaintiffs did not

---

[6]Justice Kennedy, joined by Chief Justice Rehnquist and Justice O'Connor, dissented, arguing that *Machinists* pre-emption "rests upon that allocation of power rather than upon individual rights, privileges, or immunities." *Id.* at 117-18, 110 S.Ct. at 455.

[7]Although the Supreme Court has sometimes referred to these "prongs" in a different order, *see Blessing v. Freestone,* --- U.S. ----, ----, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997), we will refer to them in the order set out above: (1) is the provision intended to benefit the plaintiff; (2) does the provision impose a binding obligation on the governmental unit; (3) is the interest "too vague and amorphous" for judicial enforcement?

have an enforceable federal right to reasonable and adequate reimbursement. Applying its three-prong test, the Court determined that the amendment did indeed create an enforceable right to reasonable and adequate rates.

As to the first prong, the Court concluded that the amendment was intended to benefit the plaintiff class. In support of its conclusion, the Court relied on the fact that "[t]he provision establishes a system for reimbursement of providers and is phrased in terms benefitting health care providers...." *Id.* at 510, 110 S.Ct. at 2517-18.

Turning to the question whether the amendment imposed a "binding obligation" on the States, the Court looked first to the language of the statute and noted:

> The Boren Amendment is cast in mandatory rather than precatory terms: The state plan "*must*" ' "provide for payment ... of hospital[s]" according to rates the State finds are reasonable and adequate.... Moreover, provision of federal funds is expressly conditioned on compliance with the amendment and the Secretary is authorized to withhold funds for noncompliance with this provision.

*Id.* at 512, 110 S.Ct. at 2519 (emphasis in original). Then, the Court addressed the defendants' argument that the only binding obligation was an essentially procedural one: the State must provide *some* reimbursement, must itself find that its rates are reasonable, and must make assurances satisfactory to the Secretary. The Court rejected this interpretation, refusing to make the federal requirement a "dead letter": "It would make little sense for Congress to require a State to make findings without requiring those findings to be correct. In addition, there would be no reason to require a State to submit assurances to the Secretary if the statute did not require the State's findings to be reviewable in some manner by the Secretary." *Id.* at 514, 110 S.Ct. at 2520. The Court found further support for its conclusion that the Amendment created enforceable rights in the fact that the Secretary was entitled to reject a plan upon concluding that the State's assurances of compliance were unsatisfactory: "If the Secretary is entitled to reject a state plan upon concluding that a State's assurances of compliance are unsatisfactory, ... a State is on notice that it cannot adopt any rates it chooses and that the requirement that it make "findings' is not a mere formality." *Id.* Finally, the Court reviewed the legislative history of the Amendment and determined that it showed that "the

7

requirements of "findings' and "assurances' prescribe the respective roles of a State and the Secretary and do not, as petitioners suggest, eliminate a State's obligation to adopt reasonable rates." *Id.* at 519, 515-19, 110 S.Ct. at 2522, 2520-22.

Finally, the Court looked to the question whether the obligation was "too vague and ambiguous" to be judicially enforceable. The Court concluded that it was not, noting both that the statute and accompanying regulations set out factors which a State was to consider in adopting its rates and that the statute provided the objective benchmark of an "efficiently and economically operated facility." *Id.* at 519, 110 S.Ct. at 2522-23. The Court wrote:

> While there may be a range of reasonable rates, there certainly are *some* rates outside that range that no State could ever find to be reasonable and adequate under the Act. Although some knowledge of the hospital industry might be required to evaluate a State's findings with respect to the reasonableness of its rates, such an inquiry is well within the competence of the Judiciary.

*Id.* at 519-20, 110 S.Ct. at 2523.[8]

In 1992, the Court decided *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). At issue in *Suter* was a provision of the Adoption Assistance and Child Welfare Act that

---

[8]Chief Justice Rehnquist, joined by Justices O'Connor, Scalia, and Kennedy, dissented. In response to the majority's argument that the statute conferred substantive rights on health care providers, the dissenters argued that

> In light of the placement of § 1396a(a)(13)(A) within the structure of the statute, ... one most reasonably would conclude that § 1396a(a)(13)(A) is addressed to the States and merely establishes one of many conditions for receiving federal Medicaid funds; the text does not confer any substantive rights on Medicaid services providers. This structural evidence is buttressed by the absence in the statute of any express "focus" on providers as a beneficiary class of the provision.

*Id.* at 527, 110 S.Ct. at 2526-27. The dissenters went on to say that "[e]ven if one were to assume that the terms of [the statute] confer a substantive right on providers ... the statute places its own limitation on that right in very plain language":

> The first step requires the States to make certain findings. The second and only other step requires the States to make certain assurances to the Secretary and the Secretary—not the courts—to review those assurances. Under the logic of our case law, respondent arguably may bring a § 1983 action to require that rates be set according to that process.

*Id.,* at 527-28, 110 S.Ct. at 2527.

8

required participating States to submit a plan[9] which "provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home." *Id.* at 351, 112 S.Ct. at 1364 (quoting 42 U.S.C. § 671(a)(15)). The Court began its discussion of the § 1983 inquiry by reviewing its earlier decisions, noting that the opinions in those cases "took pains to analyze the statutory provisions in detail, in light of the entire legislative enactment." *Id.* at 357, 112 S.Ct. at 1367. The Court also revisited an earlier statement regarding the special concerns present in § 1983 suits brought to enforce the requirements of Congressional acts passed pursuant to the Spending Clause:

> The legitimacy of Congress' power to legislate under the spending power ... rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

*Id.* at 356, 112 S.Ct. at 1366 (quoting *Pennhurst State Sch. and Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981)[10]).

The question in the case before it, said the Court, was "Did Congress, in enacting the Adoption Act, unambiguously confer upon the child beneficiaries of the Act a right to enforce the requirement that the State make "reasonable efforts' to prevent a child from being removed from his home, and once removed to reunify the child with his family?" *Id.* at 357, 112 S.Ct. at 1367. Turning to an examination of "exactly what is required of States by the Act," the Court wrote:

---

[9]Like the Medicaid Act, the Adoption Assistance and Child Welfare Act establishes a federal reimbursement program for certain expenses incurred by the States. In order to participate in the program and receive reimbursement, the States must submit a plan to the Secretary of Health and Human Services for approval.

[10]In *Pennhurst,* the Court considered the question whether the "Bill of Rights" provision of the Developmentally Disabled Assistance and Bill of Rights Act of 1975 conferred upon the mentally retarded substantive rights to "appropriate treatment" in the "least restrictive" environment. Although the Court's decision specifically did not address the question regarding the enforceability of the provision under § 1983, 451 U.S. at 28 n. 21, 101 S.Ct. at 1545 n. 21, its statements regarding whether the Act created substantive rights are clearly relevant to the inquiry before us today.

Here, the terms of § 671(a) are clear: "In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary." Therefore the Act does place a requirement on the States, but that requirement only goes so far as to ensure that the State have a plan approved by the Secretary which contains the 16 listed features.

*Id.* at 358, 112 S.Ct. at 1367. In a footnote following this language, the Court noted:

Contrary to respondents' assertion that finding [the statute] to require only the filing of a plan for approval by the Secretary would add a new "prerequisite for the existence of a right under § 1983," ... our holding today imposes no new "prerequisites" but merely counsels that each statute must be interpreted by its own terms.

*Id.* at 358 n. 8, 112 S.Ct. at 1367 n. 8. The Court then distinguished the case before it from its previous decision in *Wilder.* In *Wilder,* the Court wrote, the statute and regulations had set forth "in some detail" the factors to be considered in determining the methods for calculating reimbursement rates; in the case before the Court, however, no further statutory guidance was given as to how to measure "reasonable efforts" to maintain an abused or neglected child in his or her home, or return the child to his or her home from foster care. *Id.* at 359-60, 112 S.Ct. at 1368. To find no federal right to "reasonable efforts" did not, according to the Court, render the provision a "dead letter" because the Secretary retained authority to reduce or eliminate payments upon a finding of noncompliance and because federal reimbursement for foster care payments made with respect to an involuntary removal from the home had to be the result of a judicial determination that continuing in the home would be contrary to the welfare of the child. *Id.* at 360-61, 112 S.Ct. at 1368-69. Finally, the Court examined the regulations promulgated to enforce the Adoption Act:

The regulations promulgated by the Secretary to enforce the Adoption Act do not evidence a view that § 671(a) places any requirement for state receipt of federal funds other than the requirement that the State submit a plan to be approved by the Secretary. The regulations provide that to meet the requirements of § 671(a)(15) the case plan for each child must "include a description of the services offered and the services provided to prevent removal of the child from the home and to reunify the family." 45 CFR § 1356.21(d)(4) (1991). Another regulation, entitled "requirements and submittal," provides that a state plan must specify "which preplacement preventive and reunification services are available to children and families in need." § 1357.15(e)(1). What is significant is that the regulations are not specific and do not provide notice to the States that failure to do anything other than submit a plan with the requisite features, to be approved by the Secretary, is a further condition on the receipt of funds from the Federal Government.

*Id.* at 361-62, 112 S.Ct. at 1369 (footnotes omitted).[11]

In the wake of *Suter,* federal courts of appeals took somewhat divergent views of what general propositions should be derived from the Court's decision and, in particular, from the Court's distinguishing of the decision in *Wilder.* According to the First Circuit, the key element of *Suter* was an instruction that "when a provision in a statute fails to impose a direct obligation on the States, instead placing the onus of [ensuring] compliance with the statute's substantive provisions on the federal government, no cause of action cognizable under section 1983 can flourish." *Stowell v. Ives,* 976 F.2d 65, 70 (1st Cir.1992). In the Second Circuit's view, "[T]he significant point in *Suter* was not that the statute in question only required a state to submit a plan to the federal agency but that the statute provided no guidance for measuring "reasonable efforts.' " *Marshall v. Switzer,* 10 F.3d 925, 929 (2d Cir.1993). The Eighth Circuit concluded that *Suter* added "additional considerations" to the approach applied in *Wilder. Arkansas Medical Soc., Inc. v. Reynolds,* 6 F.3d 519, 525 (8th Cir.1993) (noting the *Suter* Court's emphasis on the fact that rights must be "unambiguously" conferred and that each statute must be examined on its own basis).[12]

---

[11]Justice Blackmun, joined by Justice Stevens, dissented, arguing that the majority had deviated from the principles established in the Court's precedents. In the dissenters' opinion, the provision established an enforceable federal right under *Wilder.*

[12]Various panels of the Seventh Circuit have addressed the appropriate scope of *Suter* as well as the scope of previous panels' decisions regarding *Suter.* In *Clifton v. Schafer,* 969 F.2d 278 (7th Cir.1992), the panel said of *Suter:*

> The Court based its analysis, in large part, on the fact that § 671(a)(15) required only that a state have a plan providing that the state will make "reasonable efforts" to prevent removing a child from his home or to make it possible to return a removed child to his home.... Nothing in the Adoption Act placed any other specific requirement on the states or defined what "reasonable efforts" might entail.

*Id.* 969 F.2d at 284. A subsequent panel seemed to interpret *Clifton* to have taken the position that *Suter* turns on a distinction between statutes explicitly requiring state compliance and statutes requiring that the state adopt a plan providing for such compliance. *Procopio v. Johnson,* 994 F.2d 325, 332 (7th Cir.1993). However, other panels have taken a more case-specific reading of *Suter* and *Clifton. See Miller by Miller v. Whitburn,* 10 F.3d 1315 (7th Cir.1993); *City of Chicago v. Lindley,* 66 F.3d 819 (7th Cir.1995).

Our obligation to discern the law in this area does not end with interpreting *Suter*. In 1994,

Congress enacted the following amendment to the Social Security Act:

> § 1320a-2 Effect of failure to carry out State plan
>
> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in Suter v. Artist M. that section 671(a)(15) of this title is not enforceable in a private right of action.

42 U.S.C. § 1320a-2. There has been some suggestion that this statute "overrules" *Suter* entirely and

that we should determine the "federal rights" question only according to the pre-*Suter* precedents.

*See Jeanine B. by Blondis v. Thompson,* 877 F.Supp. 1268, 1283 (E.D.Wis.1995) ("[T]he court must

"rewind the clock' and look to cases prior to *Suter* to determine the enforceability of other provisions

under the Adoption Assistance Act [beyond the specific one involved in *Suter* ]."). We reject this

argument on the basis of the plain language of the statute. Section 1320a-2 does not purport to reject

any and all grounds relied upon in *Suter;* it purports only to overrule certain grounds—i.e., that a

provision is unenforceable simply because of its inclusion in a section requiring a state plan or

specifying the contents of such a plan.

 As is suggested by the above survey of the case law in other circuits, it may well be that the

grounds Congress "overruled" were never relied upon by the *Suter* Court. In other words, it may

well be that the majority never intended to suggest that substantive provisions included in legislation

requiring a State plan or specifying the contents of that State plan are *a fortiori* unenforceable under

---

Similarly, we note that while one Sixth Circuit panel embraced the First Circuit's reading of *Suter, Audette v. Sullivan,* 19 F.3d 254 (6th Cir.1994), another panel indicated that were it not bound by the previous decision, it would reject the First Circuit's approach and explain *Suter* as a decision turning on the vagueness of the "reasonable efforts" obligation. *Wood v. Tompkins,* 33 F.3d 600, 609 n. 18 (6th Cir.1994). *See also Loschiavo v. City of Dearborn,* 33 F.3d 548, 551 n. 2 (6th Cir.1994) (noting simply that the Sixth Circuit had joined other circuits in concluding that *Suter* and *Wilder* may be "harmonized"), *cert. denied,* 513 U.S. 1150, 115 S.Ct. 1099, 130 L.Ed.2d 1067 (1995).

12

§ 1983.[13]  In particular, we note that any such rule is plainly inconsistent with *Wilder,* which the Court did not overrule, but expressly distinguished.  *See LaShawn A. v. Barry,* 69 F.3d 556, 569, 568-70 (D.C.Cir.1995) (concluding that § 1320a-2 is essentially meaningless because the *Suter* Court "did not find provisions of the Adoption Assistance Act unenforceable "because of ... inclusion in a section of [the Act] requiring a State plan or specifying the required contents of a State plan' "), *superseded by decision en banc,* 87 F.3d 1389 (D.C.Cir.1996) (not addressing the *Suter* issue), *cert. denied,* --- U.S. ----, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997).  However, we need not definitively resolve the question whether *Suter* announced or implicitly stood for the rule rejected by Congress:  in light of the statute, it is clear that the mere fact that an obligation is couched in a requirement that the State file a plan is not itself sufficient grounds for finding the obligation unenforceable under § 1983.

Finally, we turn to *Blessing v. Freestone,* --- U.S. ----, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), the most recent Supreme Court case in this area.  In *Blessing,* parents of children entitled to receive child support services from the State pursuant to Title IV-D of the Social Security Act sued the director of the State child support agency under § 1983, claiming they had an enforceable right to have the State program achieve "substantial compliance" with the requirements of Title IV-D.[14] A unanimous Supreme Court reversed the Ninth Circuit's decision in favor of the plaintiffs.  After summarizing the three-factor test used to determine whether a particular statutory provision gives rise to a federal right, the Court turned to the case before it.  The Court began by rejecting the Ninth Circuit's general approach:

---

[13]The precise language of the statute, which refers to "any such grounds" applied in *Suter,* suggests that Congress itself may have been unsure if the Court intended to announce the rule referred to in the statute.

[14]A State participating in the federal Aid to Families with Dependant Children program must certify that it will operate a child support enforcement program that conforms with Title IV-D's requirements and that it will do so pursuant to a plan approved by the Secretary of Health and Human Services. *Id.* at ----, 117 S.Ct. at 1356.

> Without distinguishing among the numerous rights that might have been created by this federally funded welfare program, the Court of Appeals agreed in sweeping terms that "Title IV-D creates enforceable rights in families in need of Title IV-D services." ...

> [T]he lower court's holding that Title IV-D "creates enforceable rights" paints with too broad a brush. It was incumbent upon respondents to identify with particularity the rights they claimed, since it is impossible to determine whether Title IV-D, as an undifferentiated whole, gives rise to undefined "rights."

*Id.* at ----, 117 S.Ct. at 1360. As for the particular statutory provision requiring States to operate their child support programs in substantial compliance with Title IV-D,[15] the Court concluded that this provision "was not intended to benefit individual children and custodial parents, and therefore it does not constitute a federal right." *Id.* at ----, 117 S.Ct. at 1361. The Court explained:

> Far from creating an *individual* entitlement to services, the standard is simply a yardstick for the Secretary to measure the *systemwide* performance of a State's Title IV-D program. Thus, the Secretary must look to the aggregate services provided by the State, not to whether the needs of any particular person have been satisfied. A State substantially complies with Title IV-D when it provides most mandated services ... in only 75 percent of the cases reviewed during the federal audit period.... States must aim to establish paternity in 90 percent of all eligible cases, but may satisfy considerably lower targets so long as their efforts are steadily improving.... It is clear, then, that even when a State is in "substantial compliance" with Title IV-D, any individual plaintiff might still be among the 10 or 25 percent of persons whose needs ultimately go unmet. Moreover, even upon a finding of substantial noncompliance, the Secretary can merely reduce the State's AFDC grant by up to five percent; she cannot, by force of her own authority, command the State to take any particular action or to provide any services to certain individuals. In short, the substantial compliance standard is designed simply to trigger penalty provisions that increase the frequency of audits and reduce the State's AFDC grant by a maximum of five percent. As such, it does not give rise to individual rights.

*Id.* (emphasis in original). As for the Ninth Circuit's "blanket approach" in determining that Title IV-D creates enforceable rights, the Court concluded that "[i]t is readily apparent that many other provisions [besides the "substantial compliance' provision] ... do not fit our traditional three criteria for identifying statutory rights." *Id.* The Court wrote:

> To begin with, many provisions, like the "substantial compliance" standard, are designed only to guide the State in structuring its systemwide efforts at enforcing support obligations. These provisions may ultimately benefit individuals who are eligible for Title IV-D services, but only indirectly. For example, Title IV-D lays out detailed requirements for the State's data processing system.... Obviously, these complex standards do not give rise to

---

[15]*See* 42 U.S.C. § 609(a)(8) (authorizing the Secretary of Health and Human Services to reduce a State's AFDC grant by up to five percent if the State does not "substantially comply" with the requirements of Title IV-D).

individualized rights to computer services. They are simply intended to improve the overall efficiency of the States' child support enforcement scheme.

The same reasoning applies to the staffing levels of the state agency, which respondents seem to claim are inadequate.... Title IV-D generally requires each participating State to establish a separate child support enforcement unit "which meets such staffing and organizational requirements as the Secretary may by regulation prescribe." ... The regulations, in turn, simply provide that each level of the State's organization must have "sufficient staff" to fulfill specified functions. These mandates do not, however, give rise to federal rights. For one thing, the link between increased staffing and the services provided to any particular individual is far too tenuous to support the notion that Congress meant to give each and every Arizonan who is eligible for Title IV-D the right to have the State Department of Economic Security staffed at a "sufficient" level. Furthermore, neither the statute nor the regulation gives any guidance as to how large a staff would be "sufficient." ... Enforcement of such an undefined standard would certainly "strain judicial competence."

*Id.* at ----, 117 S.Ct. at 1361-62. Leaving open the possibility that some provisions of Title IV-D give rise to enforceable individual rights, the Court sent the case back to the district court to determine "exactly what rights, considered in their most concrete, specific form" respondents were asserting as well as whether any of the specific claims asserted an individual federal right. *Id.* at ----, 117 S.Ct. at 1362.

Although we are reluctant to state many general propositions of law in this area, we think it safe to summarize a few principles derived from the above discussion. First, the holdings of *Wright, Wilder,* and *Suter* all remain good law. Second, the three-prong "enforceable rights" test developed in *Wright* and *Wilder* remains good law. Finally, the Supreme Court's admonitions in *Suter* which fall short of proposing that State-plan statutes are *a fortiori* unenforceable under § 1983 remain good law. With these principles in mind, we proceed to determine whether plaintiffs have an enforceable right to transportation under the Medicaid statute and the accompanying regulations.

B. *Do Medicaid Recipients Have a "Federal Right" to Transportation?*

In the instant case, the plaintiffs seek to enforce a transportation requirement that appears explicitly not in the Medicaid Act, but in a federal regulation. The plaintiffs argue that the transportation regulation is a valid interpretation of at least one of several statutory provisions found at 42 U.S.C. § 1396a(a). Those provisions are as follows:

(a) A State plan for medical assistance must—

15

(1) provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them;

. . . . .

(4) provide (A) such methods of administration ... as are found by the Secretary to be necessary for the proper and efficient operation of the plan ...;

. . . . .

(8) provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals;

. . . . .

(10) (B) that the medical assistance made available to any individual described in subparagraph (A) [describing the so-called "categorically needy"]

(i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and

(ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A) ...;

. . . . .

(19) provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients;

. . . . .

(23) provide that (A) any individual eligible for medical assistance ... may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required ... who undertakes to provide him such services....

According to the plaintiffs, the regulatory and statutory provisions create a federal right to transportation to and from providers.[16]

---

[16]We note that a district court in Pennsylvania has held that the transportation regulation is enforceable through an action under § 1983. *Morgan v. Cohen,* 665 F.Supp. 1164, 1175 (E.D.Pa.1987) (relying on *Wright v. City of Roanoke Redevelopment and Hous. Auth.,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)).

We also note that in *Smith v. Vowell,* 379 F.Supp. 139 (W.D.Tex.1974), *aff'd,* 504 F.2d 759 (5th Cir.1974) (table), the court, in an action brought by Medicaid recipients under § 1983, held Texas's Medicaid plan to be "out of conformity" with the transportation regulation and ordered the State to submit a conforming plan. However, *Smith v. Vowell* nowhere addressed the question before us—i.e., is there a "federal right"

We turn initially to questions regarding the appropriate analytical approach for cases such as the instant one which involve federal regulations. As a previous panel of this court has pointed out, "There is no precedent in our circuit and those that exist are split and far from clear." *Colvin v. Housing Auth. of Sarasota, Fla.,* 71 F.3d 864, 865 n. 1 (11th Cir.1996) (concluding that the issue had been waived in the case before it). The plaintiffs point out that the Sixth Circuit has asserted that because federal regulations have the force of law, they may create enforceable rights under § 1983. *Loschiavo v. City of Dearborn,* 33 F.3d 548, 551 (6th Cir.1994), *cert. denied,* 513 U.S. 1150, 115 S.Ct. 1099, 130 L.Ed.2d 1067 (1995). Accordingly, the *Loschiavo* panel simply applied the three prongs of the "federal right" test directly to the regulation at issue—i.e., the panel asked whether the regulation was intended to benefit the plaintiff, whether the regulation imposed a mandatory obligation, and whether the regulation was capable of judicial enforcement. *Id.* at 552-53. *See also Levin v. Childers,* 101 F.3d 44, 47 (6th Cir.1996) (describing *Loschiavo* as holding "that "plaintiffs may use Section 1983 to enforce not only constitutional rights, but also those rights defined by federal statutes [and federal regulations]' ") (brackets in original).[17] Similarly, we note that three Justices of the Supreme Court have expressed the view that a valid regulation can create

to transportation enforceable under § 1983? Therefore, the decision has little persuasive effect.

[17]The Third Circuit has written in dicta that "[w]ith respect to the existence of the private rights requirement, valid federal regulations as well as federal statutes may create rights enforceable under section 1983." *West Virginia Univ. Hospitals, Inc. v. Casey,* 885 F.2d 11, 18 (3d Cir.1989) (citing *Wright* ), *cert. denied,* 496 U.S. 936, 110 S.Ct. 3213, 110 L.Ed.2d 661 (1990). We think it reads far too much into this statement to say that the Third Circuit is in agreement with the Sixth Circuit. *See also DeVargas v. Mason & Hanger-Silas Mason Co., Inc.,* 844 F.2d 714, 724 (10th Cir.1988) ("In at least some instances, violations of rights provided under federal regulations provide a basis for § 1983 suits.") (dicta).

Similarly, we note that in *Clifton v. Schafer,* 969 F.2d 278 (7th Cir.1992), the Seventh Circuit, faced with a case in which the plaintiff sued to enforce an obligation expressly imposed only by federal regulation, followed an analytical approach somewhat similar to that taken by the Sixth Circuit. In other words, the panel seemed to look "directly" to the regulation to determine whether the "federal rights" test was met. However, the panel concluded that the regulation, *if it created any right,* created only a right to insist that the State have a plan making the provision the regulation required (which the plaintiff did not dispute). *Id.* 969 F.2d at 283-84. Therefore, we do not read the decision as a holding agreeing with the Sixth Circuit approach.

17

a federal right enforceable under § 1983. In *Guardians Ass'n v. Civil Serv. Comm'n of New York,* 463 U.S. 582, 638, 103 S.Ct. 3221, 3251, 77 L.Ed.2d 866 (1983), Justice Stevens, joined by Justices Brennan and Blackmun, wrote: "[I]t is clear that the § 1983 remedy is intended to redress the deprivation of rights secured by all valid federal laws, including statutes and regulations having the force of law." According to these Justices, the rationale of *Maine v. Thiboutot,* whose holding applied expressly only to federal statutes, applies equally to administrative regulations having the force of law. *Id.* at 638 n. 6, 103 S.Ct. at 3251 n. 6.

On the other hand, we note that four Justices have suggested that "federal rights" enforceable under § 1983 cannot derive either from valid regulations alone or from any and all valid administrative interpretations of statutes creating federal rights. In *Wright v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), Justice O'Connor, joined by Chief Justice Rehnquist, Justice Powell, and Justice Scalia, wrote in dissent:

> In the absence of any indication in the language, legislative history, or administrative interpretation of the Brooke Amendment that Congress intended to create an enforceable right to utilities, it is necessary to ask whether administrative regulations *alone* could create such a right. This is a troubling issue not briefed by the parties, and I do not attempt to resolve it here. The Court's questionable reasoning that, because for four years HUD gave somewhat less discretion to the PHA's in setting reasonable utilities allowances, HUD understood Congress to have *required* enforceable utility standards, apparently allows it to sidestep the question. I am concerned, however, that lurking behind the Court's analysis may be the view that, once it has been found that a statute creates some enforceable right, *any* regulation adopted within the purview of the statute creates rights enforceable in federal courts, regardless of whether Congress or the promulgating agency ever contemplated such a result. Thus, HUD's frequently changing views on how best to administer the provision of utilities to public housing tenants becomes the focal point for the creation and extinguishment of federal "rights." Such a result, where determination of § 1983 "rights" has been unleashed from any connection to congressional intent, is troubling indeed.

*Id.* at 437-38, 107 S.Ct. at 777-78. The Fourth Circuit, citing the position of the dissent in *Wright,* has written that "[a]n administrative regulation ... cannot create an enforceable § 1983 interest not already implicit in the enforcing statute." *Smith v. Kirk,* 821 F.2d 980, 984 (4th Cir.1987). *See also*

18

*Former Special Project Employees Ass'n v. City of Norfolk,* 909 F.2d 89 (4th Cir.1990) (following *Smith v. Kirk* ).[18]

Given the fact that the view set out above represented the position of the dissenting Justices in *Wright,* we think our first obligation is to ascertain whether the majority opinion in *Wright,* which remains binding upon us, rejected the dissent's position regarding cases involving federal regulations. Ultimately, we are persuaded that the majority did not reject that position and thus that the majority's opinion does not foreclose arguments that turn on the concerns expressed by the dissent. Because careful attention to the language of the majority's opinion is required, we set out the relevant discussion again:

> The Brooke Amendment could not be clearer: as further amended in 1981, tenants could be charged as rent no more and no less than 30 percent of their income. This was a mandatory limitation focusing on the individual family and its income. The intent to benefit tenants is undeniable. Nor is there any question that HUD interim regulations, in effect when this suit began, expressly required that a "reasonable" amount for utilities be included in rent that a PHA was allowed to charge, an interpretation to which HUD has adhered both before and after the adoption of the Brooke Amendment. HUD's view is entitled to deference as a valid interpretation of the statute, and Congress in the course of amending that provision has not disagreed with it.

> Respondent nevertheless asserts that the provision for a "reasonable" allowance for utilities is too vague and amorphous to confer on tenants an enforceable "right" within the meaning of § 1983 and that the whole matter of utility allowances must be left to the discretion of the PHA, subject to supervision by HUD. The regulations, however, defining the statutory concept of "rent" as including utilities, have the force of law ..., they specifically set out guidelines that the PHAs were to follow in establishing utility allowances, and they require notice to tenants and an opportunity to comment on proposed allowances. In our view, the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under *Pennhurst* [*Pennhurst State School & Hosp. v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ] and § 1983, rights that are not, as respondent suggests, beyond the competence of the judiciary to enforce.

---

[18]For other cases in the courts of appeals dealing with causes of action relying at least in part on a regulation, see *Farley v. Philadelphia Hous. Auth.,* 102 F.3d 697 (3d Cir.1996); *Buckley v. City of Redding, Cal.,* 66 F.3d 188 (9th Cir.1995); *Albiston v. Maine Comm'r of Human Services,* 7 F.3d 258 (1st Cir.1993); *Howe v. Ellenbecker,* 8 F.3d 1258 (8th Cir.1993), *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1373, 128 L.Ed.2d 49 (1994); and *Samuels v. District of Columbia,* 770 F.2d 184 (D.C.Cir.1985). While none of these opinions articulates a general approach for dealing with such cases, we suspect that underlying at least some of these decisions are principles similar to those we articulate below. *See Farley,* 102 F.3d at 699 ("[The] cause of action arises strictly under [the statutory provision]. Regulation § 966.57(b) merely interprets that section.").

*Wright,* 479 U.S. at 430-32, 107 S.Ct. at 773-75. We do not think the passage is fairly read to hold that federal rights are created either by regulations of their own force or by any valid administrative interpretation of a statute that creates some enforceable right. We begin by noting that the majority nowhere takes issue with the dissent's suggestion that the majority did not hold so much. As for what the majority *did* say, we note the persistent focus on tying the right to a reasonable utility allowance to Congressional intent to create federal rights. We find significant in this regard the fact that the majority first focused directly on the statutory provision creating the rent ceiling, describing the provision as "a mandatory limitation focusing on the individual family and its income." In other words, the Court seemed to locate the right in the statutory provision, turning to the regulation only to answer the respondent's argument that HUD's *definition* of the statutory concept of "rent" was not authorized by the statute. *See id.* at 430 n. 11, 107 S.Ct. at 774 n. 11 ("We thus reject respondent's argument that the Brooke Amendment's rent ceiling applies only to the charge for shelter and that the HUD definition of rent as including a reasonable charge for utilities is not authorized by the statute."). Although the Court in that discussion spoke of the deference owed to valid administrative interpretations of statutes, it did so in the particular context of a regulation that merely defined the content of a specific right that, in the majority's opinion, Congress had conferred upon the plaintiffs by statute. *See* id. at 431, 107 S.Ct. at 774 (referring to the regulations as "defining the statutory concept of "rent' "). In conclusion, the Court reiterated that it believed that "the benefits *Congress* intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under *Pennhurst* and § 1983, rights that are not, as respondent suggests, beyond the competence of the judiciary to enforce." *Id.* at 432, 107 S.Ct. at 774-75 (emphasis added).[19] We conclude that the

[19]We note that footnote 3 of the majority's opinion reads in part: "The dissent may have a different view, but to us it is clear that the regulations gave low-income tenants an enforceable right to a reasonable utility allowance and that the regulations were fully authorized by the statute." *Id.* at 420 n. 3, 107 S.Ct. at 769 n. 3. We think it is possible that the majority here was referring not to the dissent's position on whether the regulation *qua* regulation could give rise to a "right," but instead to the dissent's position that, even assuming a regulation could create a federal right, the particular regulation at issue was incapable of judicial enforcement. *Id.* at 438, 107 S.Ct. at 778. In any event, we see no inconsistency between footnote 3 and our interpretation of the majority's full discussion of the "federal rights" question, and we decline to

*Wright* majority did not hold that federal rights are created either by regulations "alone" or by any valid administrative interpretation of a statute creating some enforceable right.

In our view, the driving force behind the Supreme Court's case law in this area is a requirement that courts find a Congressional intent to create a particular federal right. We find a clear expression of this in *Suter,* where the Court posed as the dispositive question: "Did Congress, in enacting the Adoption Act, unambiguously confer upon the child beneficiaries of the Act a right to enforce the requirement that the State make "reasonable efforts' to prevent a child from being removed from his home, and once removed to reunify the child with his family?" 503 U.S. at 357, 112 S.Ct. at 1367. In light of this focus, we reject the Sixth Circuit's approach—i.e., finding a "federal right" in any regulation that in its own right meets the three-prong "federal rights" test. For the same reason, we also reject the approach labeled "troubling" by the dissent in *Wright*—i.e., finding enforceable rights in any valid administrative interpretation of a statute that creates some enforceable right.

We need not in this case define the precise role which a valid regulation may play in the "federal rights" analysis.[20] *Wright* would seem to indicate that so long as the statute itself confers

read into this isolated statement any broader rule than we derive from that discussion.

[20]In addition to the role for regulations as suggested in *Wright, see* text *infra,* the Supreme Court has sometimes looked to the Secretary's understanding of Congressional intent as an interpretive aid in its own judicial effort to ascertain legislative intent. For example, the *Pennhurst* Court, in rejecting an argument that the "Bill of Rights" provision of the Developmentally Disabled Assistance and Bill of Rights Act of 1975 imposed a condition on the receipt of federal funds and created substantive rights in favor of the plaintiffs, relied in part on the Secretary's similar understanding of Congressional intent:

> Equally telling is the fact that the Secretary has specifically rejected the position of the Solicitor General. The purpose of the Act, according to the Secretary, is merely "to improve and coordinate the provision of services to persons with developmental disabilities." 45 CFR § 1385.1 (1979). The Secretary acknowledges that "[n]o authority was included in [the 1975] Act to allow the Department to withhold funds from States on the basis of failure to meet the findings [of § 6010]." 45 Fed.Reg. 31006 (1980). If funds cannot be terminated for a State's failure to comply with § 6010, § 6010 can hardly be considered a "condition" of the grant of federal funds.

*Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 23, 101 S.Ct. 1531, 1543, 67

a specific right upon the plaintiff, and a valid regulation merely further defines or fleshes out the content of that right, then the statute—"in conjunction with the regulation"—may create a federal right as further defined by the regulation.[21] In *Wright,* the statute itself conferred a specific right on

L.Ed.2d 694 (1981). Similarly, the *Wilder* Court, in holding that there was a binding obligation to actually adopt reasonable and adequate rates, noted *inter alia:*

> The Secretary has expressed his intention to withhold funds if the state plan does not comply with the statute or if there is "noncompliance in practice." *See* 42 CFR § 430.35 (1989) ("A question of noncompliance in practice may arise from the State's failure to actually comply with a Federal requirement, regardless of whether the plan itself complies with that requirement").

*Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 512, 110 S.Ct. 2510, 2519, 110 L.Ed.2d 455 (1990). Finally, in determining that the relevant statutory provision imposed upon States not a specific binding obligation, but instead a "rather generalized duty," *id.* at 363, 112 S.Ct at 1370, the *Suter* Court wrote:

> The regulations promulgated by the Secretary to enforce the Adoption Act do not evidence a view that § 671(a) places any requirement for state receipt of federal funds other than the requirement that the State submit a plan to be approved by the Secretary.

*Suter v. Artist M.,* 503 U.S. 347, 361, 112 S.Ct. 1360, 1369, 118 L.Ed.2d 1 (1992).

> In the passages quoted above, the Supreme Court relied in part on administrative understandings of Congressional intent with regard to the scope of the obligation imposed by a federal statute. In the instant situation, it appears that the Secretary has consistently taken the position that States *are* obligated to ensure necessary transportation to and from providers. *See* Brief of Amicus Curiae Secretary of Health and Human Services. However, the issue before us is a different one—whether or not Congress intended to confer upon private plaintiffs a federal right enforceable under § 1983. The transportation regulation does not evidence any administrative understanding of Congressional intent as to this point; similarly, we note that the Secretary has expressly declined in this litigation to take any position on this question. To find a federal right to transportation, we would have to accord the transportation regulation an entirely different weight than is evidenced by the Supreme Court's reliance on regulations as an interpretive aid in ascertaining Congressional intent. As we describe in detail in the text which follows, in order to find for the plaintiffs, we would have to either rely on the regulation to create a federal right of its own force or derive a federal right from an administrative interpretation that goes beyond defining the content of rights conferred by statute and instead imposes a distinct obligation in order to further the broad objectives underlying the statutory provisions.

[21]We note that we are uncertain exactly how our understanding of *Wright* squares with the Fourth Circuit's case law. To the extent that we conclude federal rights must ultimately emanate from either explicit or implicit statutory requirements, we would seem to be in agreement with the Fourth Circuit. However, we are uncertain whether the Fourth Circuit would agree with our conclusion that regulations may further define rights imposed by federal statutes.

the plaintiffs: tenants could be charged as rent no more and no less than 30% of their income. The regulation concerning the utility allowance merely defined the statutory concept of "rent." Thus, *Wright* has been described as holding that "[a] statute providing that tenants in low-income housing could only be charged 30% of their income in rent, in conjunction with regulations providing that "reasonable utilities' costs were included in the rental figure, created [a] right under § 1983 to not be charged more than a "reasonable' amount for utilities." *Suter,* 503 U.S. at 361 n. 13, 112 S.Ct. at 1369 n. 13.

On the other hand, if the regulation defines the content of a statutory provision that creates no federal right under the three-prong test, or if the regulation goes beyond explicating the specific content of the statutory provision and imposes distinct obligations in order to further the broad objectives underlying the statutory provision, we think the regulation is too far removed from Congressional intent to constitute a "federal right" enforceable under § 1983.[22] To hold otherwise would be inconsistent with the driving force of the Supreme Court precedent requiring a *Congressional* intent to create federal rights and with the Supreme Court's directive that courts must find that Congress has *unambiguously* conferred federal rights on the plaintiff. *See Suter,* 503 U.S. at 357, 112 S.Ct. at 1367; *see also Pennhurst,* 451 U.S. at 18, 24-25, 101 S.Ct. at 1540, 1543-44.

Applying these principles to the case at hand, we conclude that the transportation regulation does not define the content of any specific right conferred upon the plaintiffs by Congress. In our view, the nexus between the regulation and Congressional intent to create federal rights is simply too tenuous to create an enforceable right to transportation.[23]

---

[22]This, of course, assumes that the administrative interpretation is not implicit in the statute. It is clear under *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 112, 110 S.Ct. 444, 451, 107 L.Ed.2d 420 (1989), that "[a] rule of law that is the product of judicial interpretation of a vague, ambiguous, or incomplete statutory provision" may be enforced under § 1983.

[23]In our subsequent discussion, we assume, expressly without deciding, that the regulation is a valid interpretation of each of the provisions cited. We emphasize that we assume this only for purposes of argument; in each case, determining the validity of the regulation would require application of the analysis set out in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

23

We turn first to the "methods of administration" provision primarily relied upon by the plaintiffs and by the court below. We conclude that the plaintiffs do not have an enforceable right to "methods of administration." Just last term, in *Blessing v. Freestone,* --- U.S. ----, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), the Court distinguished between provisions of Title IV-D intended to benefit individual recipients and provisions intended "only to guide the State in structuring its systemwide efforts at enforcing support obligations." *Id.* at ----, 117 S.Ct. at 1361. We conclude that the "methods of administration" statute is intended only to guide the State in structuring its efforts to provide care and services to Medicaid recipients and, therefore, that it does not create a federal right enforceable by the plaintiffs. Because we conclude that Congress did not intend to confer upon the plaintiffs a federal right to "methods of administration," it follows that a regulation defining the precise content of that statutory requirement cannot create a federal right.

We reach a similar conclusion regarding § 1396a(a)(19), which requires that State plans provide "such safeguards as may be necessary to assure that ... care and services will be provided ... in a manner consistent with simplicity of administration and the best interests of the recipients." We conclude that this section imposes only a generalized duty on the States—in other words, the provision is insufficiently specific to confer any particular right upon the plaintiffs. *See Suter,* 503 U.S. at 363, 112 S.Ct. at 1370 ("[T]he 'reasonable efforts' language does not unambiguously confer an enforceable right upon the Act's beneficiaries. The term 'reasonable efforts' in this context is at least as plausibly read to impose only a rather generalized duty on the States."). Other courts have reached similar conclusions with respect to § 1396a(a)(19). *See Bumpus v. Clark,* 681 F.2d 679, 683 (9th Cir.1982) ("Section 1396a(a)(19) is not the sort of specific condition for receipt of federal funds which can be said to create substantive rights in Medicaid recipients."), *opinion withdrawn as moot,* 702 F.2d 826 (9th Cir.1983); *Stewart v. Bernstein,* 769 F.2d 1088, 1093 (5th Cir.1985) (citing *Bumpus* with approval); *Cook v. Hairston,* No. 90-3437, 948 F.2d 1288 (6th Cir. Nov.26, 1991) (unpublished disposition) ("[T]he district court did not err in finding that the [provisions] in question

24

were not sufficiently specific and definite to permit enforcement through § 1983.").[24]  Again, we do not believe that in the absence of a federal right created by Congress, an implementing regulation can create a right enforceable under § 1983.

 Next, we turn to the provision of § 1396a which requires that a State plan "provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them." § 1396a(a)(1).  The gist of the plaintiffs' argument with regard to this provision seems to be that providing transportation to and from providers is necessary to ensure that the plan is truly "in effect" in all areas of the State.  However, the Supreme Court has rejected a similar argument in the Title IV-D context.  In *Suter,* the plaintiffs relied on the analogous provision in Title IV-D[25] to argue that the State had a substantive obligation enforceable in a § 1983 action to make the

_____

[24]In addition to our concern that the provision is insufficiently specific to confer enforceable rights on the plaintiff, we also suspect that such an obligation is "too vague and amorphous" to be capable of judicial enforcement.  To ask a court to determine whether a State practice complies with the broad, and sometimes competing, goals of "simplicity of administration" and "the best interests of the recipients" would likely strain judicial competence.

    We recognize that the Supreme Court has sometimes looked to regulations in determining whether the interest asserted by the plaintiff is "too vague and amorphous" to be judicially enforceable.  For example, the *Wright* Court, in rejecting a "too vague and ambiguous" argument, wrote:  "The regulations ... defining the statutory concept of "rent' as including utilities have the force of law, ... they specifically set out guidelines that the PHAs were to follow in establishing utility allowances, and they require notice to tenants and an opportunity to comment on proposed allowances."  479 U.S. at 431, 107 S.Ct. at 774.  Similarly, the *Wilder* Court, in rejecting an argument that the "reasonable and adequate reimbursement" obligation was "too vague and amorphous," relied in part on the implementing regulations:  "As in *Wright,* the statute and regulations set out factors which a State must consider in adopting its rates...."  496 U.S. at 519, 110 S.Ct. at 2522.  We find significant the fact that in each case the statute itself set out a particular right, and the regulation only *further* defined the content of that right.  In our view, the Court's approach in these cases is closely related to our holding above.  We have held that where a statute confers a specific right upon the plaintiff, and a valid regulation further defines or fleshes out the precise content of that right, then the statute "in conjunction with" the regulation may create a federal right as further defined by the regulation.  Similarly, the quoted portions of *Wright* and *Wilder* suggest that courts can look to regulations to flesh out the precise content of specific rights conferred by statute and, thus, bring those rights within the realm of judicial enforceability.  As we have stated above, we simply cannot conclude that § 1396a(a)(19) confers any specific right upon the plaintiffs.

[25]42 U.S.C. § 671(a)(3) reads:  "In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which ... provides that the plan shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them."

"reasonable efforts" required elsewhere in the statute;  if such efforts were not made, the argument apparently went, the plan would not be "in effect."  The Court rejected this argument:  "[W]e think that "in effect' is directed to the requirement that the plan apply to all political subdivisions of the State, and is not intended to otherwise modify the word "plan.' "  *Suter,* 503 U.S. at 359, 112 S.Ct. at 1368.  The Court's conclusion that the "shall be in effect" provision of the Adoption Assistance Act requires only that the plan apply to all political subdivisions would seem to foreclose arguments (such as the plaintiffs') that attempt to use "shall be in effect" provisions in other State-plan legislation as a bootstrap for enforcing requirements imposed on such plans by other statutory provisions.

Finally, we find no right under the regulation read in conjunction with any of the remaining statutory sections cited by the plaintiffs:  § 1396a(a)(8), which requires that State plans provide that "individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals";  § 1396a(a)(10)(B), which requires that State plans provide that medical assistance provided to any "categorically needy" recipient shall not be less "in amount, duration, or scope" than the assistance made available to other categorically needy recipients or to "medically needy" recipients;[26]  or § 1396a(a)(23), which requires that the State plan provide that individuals eligible for medical assistance may obtain such assistance from qualified providers who undertake to provide the service or services required.  It may be that each of these statutes creates some federal right;[27] similarly, it may be that the transportation regulation is a valid interpretation of each of these provisions under *Chevron.*  However, we do not think these two factors, even if we found both to

---

[26]The precise distinction between categorically needy recipients and medically needy recipients is a technical one not relevant to the case before us today.  For present purposes, it is only necessary to understand that § 1396a(a)(10)(B) is designed to ensure that "categorically needy" recipients—who are, generally speaking, the most needy recipients—receive assistance comparable to the assistance received by other categorically needy recipients and by "medically needy" recipients.

[27]We assume for the sake of argument only that these provisions create some federal right.

be true, would add up to a federal right to transportation. In each case the transportation regulation would be valid not because it reasonably defines the content of rights created by the statutory provisions, as did the regulation in *Wright,* but only because the regulation furthers the broad objectives underlying each statutory provision. In other words, we do not think that transportation to and from providers is reasonably understood to be part of the *content* of a right to prompt provision of assistance, comparable assistance, or choice among providers. Instead, if the regulation is a valid interpretation of these provisions, it would be because transportation may be a reasonable means of *ensuring* the prompt provision of assistance, comparable assistance, or choice among providers. Such links to Congressional intent may be sufficient to support the validity of a regulation; however, we think they are too tenuous to support a conclusion that Congress has unambiguously conferred upon Medicaid recipients a federal right to transportation enforceable under § 1983.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the plaintiffs do not have a federal right, enforceable under § 1983, to transportation to and from Medicaid providers.[28] We therefore reverse the judgment of the district court and remand with instructions to grant the State's motion to dismiss.

REVERSED and REMANDED.

KRAVITCH, Senior Circuit Judge, dissenting:

I disagree with the reasoning and the result of the majority opinion on several grounds. First, the majority improperly decides an issue that, in my view, the State waived. Moreover, the majority's analysis of enforceable rights violates established law, which holds that a federal statute and a validly promulgated regulation can create an enforceable right, actionable under 42 U.S.C. § 1983, if the statute and regulation together meet the three prongs of the test reiterated in *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 509, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990) (citations

---

[28]We note briefly that we do not hold that the State is under no obligation to comply with the transportation regulation. This is simply a different question from the one we decide today.

27

omitted).  Finally, even if the majority's new approach to enforceable rights were correct, the plaintiffs in this case still have demonstrated an enforceable right to "necessary transportation ... to and from providers" under the Medicaid statute, 42 U.S.C. § 1396a(a), and the applicable regulation, 42 C.F.R. § 431.53. Accordingly, I respectfully dissent.

## I.

In its initial brief on appeal, the State asserted that the plaintiffs have no right to transportation under the Medicaid statute.  The State based this argument solely on its claim that the regulation in question exceeds the scope of the enabling statute.  *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984).  The State did not challenge the district court's holding that regulations deemed valid under *Chevron* can be considered together with the relevant statute under all three prongs of the *Wilder* test.[1]  The majority thus errs in resolving a claim that the State abandoned.[2]

## II.

----

[1]*See Harris v. James,* 883 F.Supp. 1511, 1521 (M.D.Ala.1995).  In its initial brief on appeal, the State referred to many of the same Supreme Court cases relied on by the majority, *see infra* note 3, but it did not dispute that regulations could be considered under the three-prong *Wilder* test.  Instead, the State argued that "the Secretary's regulation for transportation services exceeds the mandate of the Congressional statute and, therefore, is not a right within the meaning of § 1983."  Appellant's Brief at 19.

[2]An appellant's argument must be in its initial brief in order not to be considered waived. *McGinnis v. Ingram Equipment Co., Inc.,* 918 F.2d 1491, 1496-97 (11th Cir.1990);  9 James Wm. Moore, *Moore's Federal Practice* ¶ 328.20 228.02[4],[7] (3d ed.1997).  *See* Fed.R.App.P. 28(a) (describing required contents of appellant's brief).  A claim absent from an appellant's initial brief is considered abandoned even if the court subsequently requests supplemental briefing.  *See Maryland People's Counsel v. F.E.R.C.,* 760 F.2d 318, 319-20 (D.C.Cir.1985) (Scalia, J.) (deeming an issue waived where a party did not raise it on appeal until after the court requested a supplemental briefing) (citing C. Wright & A. Miller, *Federal Rules of Civil Procedure* § 1295 (1969)).  *See also Horsley v. State of Ala.,* 45 F.3d 1486, 1497 (11th Cir.), *cert. denied,*--- U.S. ----, 116 S.Ct. 410, 133 L.Ed.2d 328 (1995) (Hatchett, J., dissenting) (concluding that state waived harmless error argument when it raised claim only in response to the panel's request for a supplemental briefing).  Moreover, the majority does not rely on the Supreme Court's recent decision in *Blessing v. Freestone,* --- U.S. ----, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), in concluding that a statute and a valid regulation promulgated thereunder may not be considered together under the three prongs of the *Wilder* test;  thus, the fact that the State filed its initial brief prior to *Blessing* does not excuse the brief's failure to articulate a *Wilder* challenge.  *Cf.* Fed.R.App.P. 2 advisory committee's note (authorizing courts to relieve litigants of consequences of default where manifest injustice would otherwise result).

Rather than addressing the *Chevron* question raised by the State in its initial brief, the majority thoroughly examines several Supreme Court cases[3] and discovers in them a new framework for determining whether federal statutes and regulations create rights actionable under § 1983. Using this framework, the majority concludes that the plaintiffs do not have an enforceable right to transportation under § 1983. In my view, this analysis is contrary to governing Supreme Court precedent.

Plaintiffs asserting a violation of federal law under § 1983 must first demonstrate that an enforceable federal right exists. According to the established three-prong test restated in *Wilder,* such an enforceable right exists if:  1) the statutory provision is intended to benefit the plaintiffs; 2) the provision imposes a binding obligation on the governmental unit;  and 3) the interest asserted by the plaintiffs is not "too vague and amorphous" for judicial enforcement. 496 U.S. at 509, 110 S.Ct. at 2517. *See also Blessing v. Freestone,* --- U.S. ----, ----, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997). If these three conditions are met, then a § 1983 remedy is presumptively available.[4] Furthermore, as demonstrated *infra,* even if a statutory provision alone does not satisfy the *Wilder* test, the statutory provision and a valid regulation promulgated thereunder may satisfy the test and thus confer a specific enforceable right.

The majority, however, develops a new approach to analyzing whether a statute and a valid regulation together create an enforceable right. It divines a stringent requirement that plaintiffs must satisfy in order to demonstrate that an enforceable right exists:  "In our view, the driving force

---

[3]*See Blessing v. Freestone,* --- U.S. ----, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997);  *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992);  *Wilder, supra;  Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989);  *Wright v. City of Roanoke Redevelopment and Hous. Auth.,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987);  *Pennhurst State Sch. and Hosp. v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

[4]As the Court held in *Golden State,* "The burden to demonstrate that Congress has expressly withdrawn the remedy is on the defendant. We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right." 493 U.S. at 107, 110 S.Ct. at 449 (citations and internal quotation omitted). *See also Blessing,* --- U.S. at ----, 117 S.Ct. at 1360; *Wright,* 479 U.S. at 423-24, 107 S.Ct. at 770.

behind the Supreme Court's case law in this area is a requirement that courts find a Congressional intent to create a particular federal right."

From this general premise, the majority derives the following test for determining whether regulations can help create rights actionable under § 1983. A regulation can be used to create an enforceable right if the statute itself confers an enforceable right and the regulation "merely further defines or fleshes out the content of that right." A regulation, however, is "too far removed from Congressional intent" and thus cannot help create an enforceable right if either: 1) the regulation defines the content of a statutory provision that itself creates no enforceable right; or 2) the regulation "goes beyond explicating the specific content of the statutory provision and imposes distinct obligations in order to further the broad objectives underlying [that] provision."

The majority's framework is based primarily on *Wright v. City of Roanoke Redevelopment and Hous. Auth.,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987). In that case, a statutory provision created an enforceable right to have rental payments capped at a certain percentage of income, and a regulation defined rent to include charges for "reasonable amounts of utilities" *Id.* at 419-20, 107 S.Ct. at 768-69. The Court held that "the regulations gave low-income tenants an enforceable right to a reasonable utility allowance...." *Id.* at 420 n. 3, 107 S.Ct. at 769 n. 3. Generalizing from this single case, the majority concludes that a regulation can help create an enforceable right *only* in those cases, as in *Wright,* where the statute standing alone confers an enforceable right, and the regulation merely "fleshes out" the content of that right.

The majority's approach, however, is fundamentally flawed. By requiring § 1983 plaintiffs to demonstrate "Congressional intent to create a particular federal right," the majority appears to depart from the three-prong *Wilder* test.[5] According to *Wilder,* § 1983 plaintiffs may assert an enforceable right under a statute simply by proving that the provision in question satisfies each of the three prongs. 496 U.S. at 509, 110 S.Ct. at 2517. Under this test, the only Congressional intent

_____

[5]The majority admits that the *Wilder* test, recently employed in *Maynard v. Williams,* 72 F.3d 848, 852 (11th Cir.1996), is still "good law," but the majority's actual holding belies that concession.

30

that the plaintiffs must show is the intent to benefit them. The majority, by contrast, would impose on § 1983 plaintiffs the more stringent burden of showing that Congress *affirmatively intended to create a specific federal right* enforceable under § 1983. This requirement is contrary to established law.

The majority appears to have imported into the § 1983 context the framework established by *Cort v. Ash,* 422 U.S. 66, 78-85, 95 S.Ct. 2080, 2088-91, 45 L.Ed.2d 26 (1975), for determining whether a federal statute creates an implied right of action. As the Court held in *Wilder:*

> In implied right of action cases, we employ the four-factor *Cort* test to determine whether Congress intended to create the private remedy asserted for the violation of statutory rights. The test reflects a concern, grounded in separation of powers, that Congress rather than the courts controls the availability of remedies for violations of statutes.

496 U.S. at 509 n. 9, 110 S.Ct. at 2517 n. 9 (citations and internal quotation omitted). Such an affirmative showing of specific Congressional intent is not necessary to establish a § 1983 cause of action, however. The *Wilder* Court continued:

> Because § 1983 provides an alternative source of express congressional authorization of private suits, these separation-of-powers concerns are not present in a § 1983 case. Consistent with this view, we recognize an exception to the general rule that § 1983 provides a remedy for violation of federal statutory rights only when Congress has affirmatively withdrawn the remedy.

*Id.* (citations and internal quotation omitted). By demanding that § 1983 plaintiffs establish that Congress specifically intended to create an enforceable right, the majority thus fundamentally alters the law governing § 1983 causes of action.

Furthermore, the majority's treatment of regulations in its enforceable rights analysis is inconsistent with Supreme Court precedent and with the approach taken by most courts of appeals. Under established law, even if a statutory provision alone does not confer a specific enforceable right, the statutory provision *together* with valid regulations promulgated thereunder may create such a right. The proper methodology, employed by the Supreme Court and by the courts of appeals in at least eight circuits,[6] is to consider *both* the statute and its implementing regulations in

---

[6]The First, Second, Third, Sixth, Seventh, Eighth, Ninth, and District of Columbia Circuits all have found it appropriate to consider regulations in conducting the *Wilder* inquiry. *See Farley v.*

determining whether an enforceable right exists under the *Wilder* test and in defining the precise contours of such a right.

Thus, courts consistently have considered regulations under the first prong of the *Wilder* test, which provides that a statute must be intended to benefit the plaintiffs in order to create an enforceable right. In *Blessing,* for example, the Court evaluated whether two statutory provisions were intended to benefit the plaintiffs by analyzing the statutory provisions *in conjunction with* their implementing regulations.[7] Courts of appeals also have considered regulations under the first prong of the *Wilder* test.[8] It is proper, therefore, to refer to an agency's interpretation of a statute in deciding whether Congress intended to benefit the plaintiffs.

Similarly, courts consistently have considered regulations under the second prong of the *Wilder* test, which provides that a statute must be binding in order to create an enforceable right. In *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), for example, the Court examined the regulations promulgated under the Adoption Assistance and Child Welfare Act to

---

*Philadelphia Hous. Auth.,* 102 F.3d 697, 702 (3d Cir.1996); *Doe by Fein v. Dist. of Columbia,* 93 F.3d 861, 867 (D.C.Cir.1996); *Tony L. By and Through Simpson v. Childers,* 71 F.3d 1182, 1189 (6th Cir.1995), *cert. denied,*--- U.S. ----, 116 S.Ct. 1834, 134 L.Ed.2d 938 (1996); *City of Chicago v. Lindley,* 66 F.3d 819, 827 (7th Cir.1995); *Buckley v. City of Redding, Cal.,* 66 F.3d 188, 192 (9th Cir.1995); *Loschiavo v. City of Dearborn,* 33 F.3d 548, 552-53 (6th Cir.1994), *cert. denied,* 513 U.S. 1150, 115 S.Ct. 1099, 130 L.Ed.2d 1067 (1995); *Martinez v. Wilson,* 32 F.3d 1415, 1421 & n. 4 (9th Cir.1994); *Howe v. Ellenbecker,* 8 F.3d 1258, 1263 (8th Cir.1993), *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1373, 128 L.Ed.2d 49 (1994), *overruled by Blessing, supra; Albiston v. Maine Comm'r of Human Servs.,* 7 F.3d 258, 265 (1st Cir.1993), *overruled in part by Blessing, supra; Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306, 1313-14 (2d Cir.1991).

[7]First, the Court held that the detailed statutory and regulatory requirements for States' data processing systems only benefited individuals indirectly and did not give rise to individualized rights to computer services.at ----, 117 S.Ct. at 1361. The Court also determined that the statutory and regulatory staffing mandates did not give rise to individualized rights, in part because of the tenuous link between increased staffing and the benefits provided to individuals.at ---- - ----, 117 S.Ct. at 1361-62.

[8]*See Farley,* 102 F.3d at 702 (concluding that plaintiff "is an intended beneficiary of [the statutory provision] and its accompanying HUD regulations"); *Buckley,* 66 F.3d at 192 ("[T]he Act clearly is intended to benefit the plaintiffs. The Act's regulations unambiguously state a purpose to increase access to waterways for recreational boaters and fishermen."); *Loschiavo,* 33 F.3d at 552 ("We have no doubt that the [plaintiffs] ... were intended beneficiaries of this regulation.").

determine whether the statute created a duty binding on the State. 503 U.S. at 361, 112 S.Ct. at 1369 ("The regulations ... do not evidence a view that § 671(a) places any requirement for state receipt of federal funds other than the requirement that the State submit a plan to be approved by the Secretary.").[9] In *Wilder,* the Court cited and described regulatory provisions to support its conclusion that participating states have binding obligations to adopt reasonable and adequate Medicaid rates. 496 U.S. at 512 & 513 n. 11, 110 S.Ct. at 2519 & n. 11 (citing 42 C.F.R. §§ 430.35, 447.253(a),(b) (1989)). Courts of appeals also have considered regulations under the second prong of the *Wilder* test.[10]

Finally, courts consistently have considered regulations under the third prong of the *Wilder* test, which provides that a statute does not create an enforceable right if the interest asserted is too "vague and amorphous" for judicial enforcement.[11] In *Wilder* itself, the Court examined a statutory provision that required a State to pay hospitals such "rates [that] the State finds are reasonable and adequate." 496 U.S. at 512, 110 S.Ct. at 2519 (citing 42 U.S.C. § 1396a(a)(13)(A) (1982 ed., Supp. V)). As the Court subsequently explained in *Suter,* the *Wilder* Court

> held that the Boren Amendment actually required the States to adopt reasonable and adequate rates, and that this obligation was enforceable by the providers. We relied in part on the fact that the statute *and regulations* set forth in some detail the factors to be considered in determining the methods for calculating rates.

---

[9]As described in Part III.C, *infra,* Congress subsequently overruled this limited interpretation of a State's obligations under the Social Security Act. *See* 42 U.S.C. § 1320a-2.

[10]*See Farley,* 102 F.3d at 702 (finding that language of statute and regulation was "mandatory, specific and clear"); *Doe by Fein,* 93 F.3d at 867 (stating that statutory provision failed *Wilder* test because regulations, unlike regulations in *Wilder,* were not mandatory); *Tony L. By and Through Simpson,* 71 F.3d at 1189 (concluding that statutory provision failed *Wilder* test because neither statute nor regulations were mandatory); *Loschiavo,* 33 F.3d at 552 (stating that regulation included "sufficient mandatory language ... to create a binding obligation...."); *Howe,* 8 F.3d at 1263 (finding that statute and regulations established mandates that were "particular and specific enough to impose binding obligations"); *Albiston,* 7 F.3d at 265 (concluding that statutory and regulatory provisions "impose[d] a specific, definite and mandatory obligation"); *Pinnacle Nursing Home,* 928 F.2d at 1313-14 (describing how *Wilder* Court, in concluding that statutory provision was mandatory, relied on both statutory and regulatory language).

[11]Indeed, the State concedes that this court may consider a statute together with regulations under the third prong of the *Wilder* test. Appellant's Letter Brief at 2.

503 U.S. at 359, 112 S.Ct. at 1368 (emphasis added) (citing *Wilder,* 496 U.S. at 519 n. 17, 110 S.Ct. at 2522 n. 17). Courts of appeals also have considered regulations under the third prong of the *Wilder* test.[12]

By concluding that the statute, *standing alone,* must meet all three prongs of the *Wilder* test, the majority thus departs from Supreme Court precedent and the established practice of most courts of appeals. In support for its novel position, the majority merely cites a passage from a Fourth Circuit panel decision, *Smith v. Kirk,* 821 F.2d 980, 984 (4th Cir.1987),[13] an opinion which was written prior to *Wilder, Suter,* and *Blessing,* and which has not been cited by any other court of appeals to date. On the other hand, the Supreme Court and eight circuit courts of appeals have considered regulations in determining whether a statutory provision creates enforceable rights, and they have used regulations to determine the precise countours of those rights.[14] The majority thus erects its analysis upon a very thin, and, in my view, insufficient, legal foundation.

III.

---

[12]*See Farley,* 102 F.3d at 702 (concluding that language of statute and regulation "is not too vague or amorphous to be enforced by courts"); *Lindley,* 66 F.3d at 827 (finding no enforceable right where regulations provided no clear guidance but instead merely tracked "amorphous statutory language"); *Buckley,* 66 F.3d at 192 (holding that statute was unambiguous because of clear command of regulation); *Loschiavo,* 33 F.3d at 552-553 (concluding that regulation was sufficiently "unambiguous" and "straightforward" to establish enforceable right); *Martinez,* 32 F.3d at 1421 & n. 4 (finding no § 1983 right of action where statute had "no manageable standards" and implementing regulations were "no clearer"); *Howe,* 8 F.3d at 1263 (finding that statute and implementing regulations established mandates that were "particular and specific enough to impose binding obligations"); *Albiston,* 7 F.3d at 265 (concluding that statutory and regulatory provisions imposed "a specific, definite and mandatory obligation").

[13]The court in *Kirk* held simply that "[a]n administrative regulation ... cannot create an enforceable § 1983 interest not already implicit in the enforcing statute." *Id.* 821 F.2d at 984.

[14]The Ninth Circuit's decision in *Buckley, supra,* renders meaningless its previous dicta in *Howard v. City of Burlingame,* 937 F.2d 1376, 1380 & n. 4 (9th Cir.1991)(stating that regulations may "define legal obligations enforceable under § 1983," but that there is "some question as to whether they may create rights not already implied by the enabling statute"). The Fifth Circuit appears not to have determined how to treat regulations in conducting the *Wilder* inquiry. *See Gracia v. Brownsville Hous.,* 105 F.3d 1053, 1057 (5th Cir.1997) ("[I]t is not clear that regulations can be considered "laws' for purposes of creating a right actionable under section 1983."), *cert. denied,* --- U.S. ----, 118 S.Ct. 171, --- L.Ed.2d ---- (1997) (No. 97-150).

Whether analyzed under the majority's framework or under the established *Wilder* test, the plaintiffs have an enforceable right to transportation to and from Medicaid providers. This enforceable right is conferred by 42 U.S.C. § 1396a(a) and 42 C.F.R. § 431.53, a valid regulation promulgated thereunder.

A.

According to 42 C.F.R. § 431.53, which appears under Part 431, Subpart B, entitled "General Administrative Requirements":

A State plan must—

(a) Specify that the Medicaid Agency will ensure necessary transportation for recipients to and from providers; and

(b) Describe the methods that the Agency will use to meet this requirement.

This administrative transportation requirement has existed in almost identical form since the very beginning of the Medicaid program.[15]

According to the Secretary, the transportation regulation was promulgated pursuant to several subsections of 42 U.S.C. § 1396a(a), including (4), (8), and (19). Medical Assistance Manual, MSA-PRG-17, § 6-20-20.A (June 6, 1972), Secretary's Exhibit A, at 1 (also basing regulation on § 1396a(a)(1),(10), and (23)). These subsections state:

A State plan for medical assistance must—

\* \* \* \* \* \*

(4) *provide (A) such methods of administration* (including methods relating to the establishment and maintenance of personnel standards on a merit basis ... ) *as are found by the Secretary to be necessary for the proper and efficient operation of the plan ...*;

---

[15]Adequate transportation was one of the original "criteria to assure high quality of the care and services provided under" State Medicaid plans. Supplement D to the Handbook of Public Assistance Administration § D-5130(2)(b) (June 17, 1966), Secretary's Exhibit B. The transportation requirement was included in the initial interim rules for the Medicaid program, *see* 33 Fed.Reg. 16,165 (1968), then codified at 45 C.F.R. § 249.10(a)(4) (1970)(stating that State plan must "specify that there will be provision for assuring necessary transportation of recipients to and from providers of services and describe the methods that will be used"), relocated to 45 C.F.R. § 249.10(a)(5)(ii) (1974), relocated to 45 C.F.R. § 449.10(a)(5)(ii) (1977), and finally slightly revised and relocated to 45 C.F.R. § 431.53 (1978). *See* 43 Fed.Reg. 45,176, 45,188 (1978) (reorganizing Medicaid regulations "without making any substantive change").

35

\* \* \* \* \* \*

(8) *provide that* all individuals wishing to make application for *medical assistance* under the plan shall have opportunity to do so, and that such assistance *shall be furnished* with reasonable promptness *to all eligible individuals;*

\* \* \* \* \* \*

(19) *provide such safeguards as may be necessary to assure that* eligibility for *care and services under the plan* will be determined, and such care and services *will be provided, in a manner consistent with* simplicity of administration and *the best interests of the recipients;*

42 U.S.C. § 1396a(a) (emphasis added).

The transportation regulation is a valid exercise of the broad rule-making authority granted to the Secretary by 42 U.S.C. § 1302(a). As the Secretary has explained, "The requirement for transportation is based on experience and recognition that *the needy will not be able to obtain necessary and timely medical care if they are without the means of getting to the providers of service.*" Medical Assistance Manual, MSA-PRG-17, § 6-20-20.A (June 6, 1972), Secretary's Exhibit A, at 2. The transportation regulation thus is a reasonable interpretation of § 1396a(a)(4),(8), and (19) because the provision of transportation services is an essential element of plan administration[16] and because Medicaid recipients can only receive medical assistance, care, and services if they have adequate transportation. Moreover, Congress effectively has consented to the Secretary's contemporaneous construction of the original Medicaid statute. *See Equal Employment Opportunity Comm'n v. Associated Dry Goods Corp.,* 449 U.S. 590, 600 n. 17, 101 S.Ct. 817, 823 n. 17, 66 L.Ed.2d 762 (1981) (holding that, where Congress for fifteen years never expressed its disapproval of EEOC's contemporaneous construction of its founding statute, Congress's silence "suggests its consent to the Commission's practice"). Because a regulation is valid if it is based on a permissible construction of the statute and is not contrary to clearly expressed Congressional intent, *see Chevron,* 467 U.S. at 842-43, 104 S.Ct. at 2781-82, the transportation regulation represents a valid exercise of agency authority. *See Daniels v. Tennessee Dep't of Health and*

---

[16]*See* Secretary's Brief at 5-7 (explaining why states benefit from the flexibility of being able to provide transportation either as an administrative activity, *see* 42 C.F.R. § 431.53, or as an optional medical service, *see* 42 U.S.C. § 1396d(a)(xi)(25) and 42 C.F.R. § 440.170(a)).

*Environment,* No. 79-3107, (M.D.Tenn. Feb.20, 1985) (stating that transportation regulation is within agency authority); *Smith v. Vowell,* 379 F.Supp. 139, 152-53 (W.D.Tex.), *aff'd,* 504 F.2d 759 (5th Cir.1974) (pre-*Chevron* case concluding that transportation regulation was valid interpretation of statute).

B.

Even if the majority's enforceable rights approach were correct, the plaintiffs in this case still would have an enforceable right to transportation under 42 U.S.C. § 1396a(a)(8). This statutory provision, standing alone, creates an enforceable right to *medical assistance.* It plainly satisfies the first two prongs of the *Wilder* test because it is intended to benefit the plaintiffs and is mandatory on the States.[17] Furthermore, even though the term "reasonable promptness" is arguably vague,[18] § 1396a(a)(8) is specific and definite in its command that "all eligible individuals" be furnished "medical assistance." Because § 1396a(a)(8) would be judicially enforceable against a State that refused to provide medical assistance to eligible individuals, the statutory provision plainly satisfies the third prong of the *Wilder* test. Thus, standing alone, § 1396a(a)(8) confers upon the plaintiffs an enforceable right to medical assistance.

Moreover, as determined by the Secretary, *see supra* III.A, eligible individuals must have transportation in order to obtain medical assistance. Transportation to and from medical providers is thus an essential element of the right to medical assistance. Stated another way, the right to medical assistance *includes* the right to transportation.[19]

[17]*See infra* Part III.C.

[18]*But see Albiston,* 7 F.3d at 267 (employing regulation to "demarcate the contours of reasonable "promptness' in the Title IV-A context").

[19]Indeed, transportation to and from medical providers is so essential to recipients' receipt of medical services that the right to transportation is implicit in the statute itself. *Cf., Livadas v. Bradshaw,* 512 U.S. 107, 132-34, 114 S.Ct. 2068, 2083-84, 129 L.Ed.2d 93 (1994) (concluding that plaintiff had enforceable rights to complete collective-bargaining process and agree to an arbitration clause because such rights "if not provided in so many words" were "imminent in [the] structure" of National Labor Relations Act); *Golden State,* 493 U.S. at 111, 110 S.Ct. at 451 ("The violation of a federal right that has been found to be implicit in a statute's language and structure is as much a "direct violation' of a right as is the violation of a right that is clearly

Under the majority's own framework, therefore, the plaintiffs have an enforceable right to transportation. The statute itself confers an enforceable right to medical assistance, and the regulation merely further defines that right to include the right to transportation. This squarely meets the majority's requirement that "so long as the statute itself confers a specific right upon the plaintiff, and a valid regulation merely further defines or fleshes out the content of that right, then the statute—"in conjunction with the regulation'—may create a federal right as further defined by the regulation."

Furthermore, the regulation at issue does not violate the majority's admonition that a regulation that helps to create an enforceable right must not be "too far removed from Congressional intent." To the contrary, because the agency's transportation requirement originated contemporaneously with the founding statute, Congress effectively has consented to the regulation. *See Associated Dry Goods Corp.,* 449 U.S. at 600 n. 17, 101 S.Ct. at 823 n. 17. Therefore, even under the majority's own framework, the plaintiffs have asserted an enforceable right to transportation under 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 431.53.

C.

Similarly, the statutory provisions, considered in conjunction with the transportation regulation, create an enforceable right to transportation under the established *Wilder* test abandoned by the majority. Although only one of the authorizing statutory provisions, considered together with the regulation, needs to meet the three-part *Wilder* test in order for the plaintiffs to have an enforceable right to transportation, all three of the cited statutory provisions confer such a right.

First, each statutory provision, viewed in conjunction with the implementing regulation, is intended to benefit the plaintiffs. Both § 1396a(a)(8), requiring medical assistance to be furnished promptly to all eligible individuals, and § 1396a(a)(19), requiring assurances that care and services will be provided in a manner consistent with recipients' best interests, are plainly intended for the benefit of the plaintiffs, and the transportation regulation is necessary to effectuate this purpose. *Cf.*

set forth in the text of the statute.").

*Silver v. Baggiano,* 804 F.2d 1211, 1216-17 (11th Cir.1986) (concluding that Medicaid statute in general and "free choice" provision, 42 U.S.C. § 1396a(a)(23), in particular were intended to benefit Medicaid recipients). Similarly, § 1396a(a)(4), when considered together with the transportation regulation, is intended to benefit the plaintiffs.[20]

Second, the statutory provisions and implementing regulation establish a binding obligation on the States. The language of the statutory provisions and the regulation is mandatory, not hortatory. Moreover, the grant of federal money is unambiguously conditioned on States' compliance with these provisions. *See* 42 U.S.C. § 1396c (stating that Secretary can suspend payments where a State plan does not comply with any provision of § 1396a or where the State, in administering the plan, fails to comply substantially with any such provision). *Cf. Pennhurst State Sch. and Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981) ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."). The State is thus bound to "ensure necessary transportation for recipients to and from providers." 42 C.F.R. § 431.53.[21]

---

[20]In *Vowell, supra,* the court stated that the transportation regulation, necessary for the efficient administration of the Medicaid program, was directly related to the plaintiffs' receipt of services:

> *A fortiori,* it is clear that the Secretary of HEW has determined the instant regulation to be necessary to the administration of the program, for the obvious (and common sense) reason that needy [sic] will not be able to obtain necessary and timely medical care if they are without the means of getting to the providers of the service.

379 F.Supp. at 150 (citations and internal quotations omitted). Thus, § 1396a(a)(4) and 42 C.F.R. § 431.53 differ from the statute and regulations considered by the Court in *Blessing,* at ----, 117 S.Ct. at 1361. There, the Court determined that "many provisions, like the "substantial compliance' standard, are designed only to guide the State in structuring its systemwide efforts at enforcing support obligations. These provisions may ultimately benefit individuals who are eligible for Title IV-D services, but only indirectly." The data processing requirements, for example, did "not give rise to individualized rights to computer services." *Id.* By contrast, as recognized by the Secretary and affirmed by the *Vowell* court, the transportation regulation at issue here is directly related to the benefits received by the plaintiffs.

[21]In *Suter,* the Court stated that the Adoption Assistance and Child Welfare Act only required that the "State have a plan approved by the Secretary which contains the 16 listed features." 503

Finally, the interest asserted by the plaintiffs, as defined by the statutory provisions and implementing regulation, is not "too vague and amorphous" for judicial enforcement. In *Wilder,* the Court explained that an enforceable right may exist even where States have wide discretion:

> That the amendment gives the States substantial discretion in choosing among reasonable methods of calculating rates may affect the standard under which a court reviews whether the rates comply with the amendment, but it does not render the amendment unenforceable by a court. While there may be a range of reasonable rates, there certainly are some rates outside that range that no State could ever find to be reasonable and adequate under the Act.... [E]valuat[ing] a State's findings with respect to the reasonableness of its rates ... is well within the competence of the judiciary.

496 U.S. at 519-20, 110 S.Ct. at 2523. *Cf. Blessing,* at ---- - ----, 117 S.Ct. at 1361-62 (concluding that the statutory and regulatory staffing mandates did not give rise to individualized rights in part because the mandates were too vague to be enforceable).

Just as the States in *Wilder* had wide discretion to establish reasonable and adequate reimbursement rates, so the States in this case have wide discretion in determining the types of transportation services to use in transporting Medicaid recipients.[22] Nonetheless, the transportation

---

U.S. at 358, 112 S.Ct. at 1367. *Suter* thus appeared to limit the enforceable rights available under those programs of the Social Security Act requiring State plans. After *Suter,* however, Congress enacted an amendment providing: "In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan." 42 U.S.C. § 1320a-2. *See Jeanine B. v. Thompson,* 877 F.Supp. 1268, 1283 (E.D.Wis.1995) (stating that after § 1320a-2 "the previous tests of *Wilder* and *Pennhurst* apply to the question whether or not the particulars of a state plan can be enforced by its intended beneficiaries"). Thus, as was true prior to *Suter,* required elements in a Medicaid State plan can establish substantive enforceable rights. *See Wilder,* 496 U.S. at 512-15, 110 S.Ct. at 2518-20 (citing Secretary's authority under § 1396c to withhold funds for non-compliance and concluding that statute required that the State actually adopt reasonable and adequate rates); *Silver,* 804 F.2d at 1216-17 (concluding that "freedom of choice" requirement in State plan established enforceable rights in Medicaid recipients) (quoting *O'Bannon v. Town Court Nursing Ctr.,* 447 U.S. 773, 785, 100 S.Ct. 2467, 2475, 65 L.Ed.2d 506 (1980)).

[22]The State Medicaid Manual, *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 14,605.89, at 6309-7 (1997), states in part:

> Federal regulations at 42 C.F.R. § 431.53 require states to assure necessary transportation to recipients to and from providers. A description of the method of assurance to be used must be included in the state's title XIX state plan. Transportation must be covered either under the state's administrative requirements, or as an optional state plan item of medical assistance, or may be included under both categories. .... [T]ransportation services for which a state

40

regulation unambiguously requires that all Medicaid recipients have transportation to and from their providers. As shown by the district court's order in this case, the interest asserted by the plaintiffs under the transportation regulation is easily enforceable. *See Harris v. James,* 896 F.Supp. 1120 (M.D.Ala.1995). The district court found that the State provides ambulance transportation only in very limited circumstances, and that the State merely helps to arrange other transportation that can be obtained without charge through volunteer groups or other sources. *Id.* 896 F.Supp. at 1132. The State "makes absolutely no provision for those occasions when transportation cannot be arranged in this fashion," and thus its plan "fails to ensure that every eligible individual will have transportation necessary for access to care under a Medicaid reimbursement scheme." *Id.*

Several other federal district courts, as well as at least one state court, also have enforced the transportation regulation.[23] Most notably, the district court in *Vowell,* in a decision summarily affirmed by the Fifth Circuit, concluded that the predecessor transportation regulation, virtually identical to the existing one, was capable of judicial enforcement:

> We read the language of the instant regulation ... as being clear and unambiguous in its command.... [T]he State does not have to "stipulate in advance" every possible mode of transportation since the situation will necessarily differ with each individual. Nevertheless, the command of the language is unmistakable—there must be some inclusive description of the primary modes of transportation that can reasonably be contemplated to be utilized.

379 F.Supp. at 159 (citation omitted). The *Vowell* court found that the State only provided transportation services in limited circumstances,[24] and thus it was "clear beyond all peradventure of doubt that the Texas State Plan in both form as well as in practice is out of compliance with the applicable Federal regulations ... and guidelines...." *Id.* Because the Fifth Circuit affirmed the

claims reimbursement as an administrative expense are not subject to the freedom-of choice provision. For such transportation, a state may designate allowable modes of transportation or arrange for transportation on a prepaid or contract basis with transit companies.

[23]*See Morgan v. Cohen,* 665 F.Supp. 1164, 1175-77 (E.D.Pa.1987); *Daniels, Fant v. Stumbo,* 552 F.Supp. 617, 618-19 (W.D.Ky.1982); *Bingham v. Obledo,* 147 Cal.App.3d 401, 404-05, 195 Cal.Rptr. 142 (Cal.Ct.App.1983).

[24]The State provided only emergency ambulance transportation to hospitals and skilled nursing facilities. *Id.* 195 Cal.Rptr. at 155-57.

*Vowell* court's determination that the transportation regulation was judicially enforceable, this court should also find the regulation to be enforceable. *See Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (holding that all decisions of the Former Fifth Circuit handed down prior to October 1, 1981, are binding on this court); *Harris v. Menendez,* 817 F.2d 737, 739 & n. 4 (11th Cir.1987) (holding a summary affirmance of district court to be binding under *Bonner* ). The authorizing statute and the transportation regulation thus satisfy the third prong of the *Wilder* test.

Because the statutory provisions and the regulation create an enforceable right to transportation under the three-prong *Wilder* test, the final question is whether the Medicaid statute itself creates a remedial scheme that is "sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy for suits under § 1983." *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981). Neither the majority nor the State contends that a sufficient remedial scheme exists here to foreclose a § 1983 remedy.[25] The plaintiffs thus have an enforceable right to transportation, actionable under § 1983.

IV.

Employing either the approach to enforceable rights proposed by the majority or the long-standing framework employed by the Supreme Court, I would hold that the Medicaid statute, 42 U.S.C. § 1396a(a), and the applicable regulation, 42 C.F.R. § 431.53, confer upon the plaintiffs an enforceable right to transportation.

I therefore respectfully DISSENT.

---

[25]The majority notes that the Court in *Wilder* rejected an argument that "Congress has foreclosed enforcement of the Medicaid Act under § 1983." 496 U.S. at 520-23, 110 S.Ct. at 2523-25.